Filed 10/29/13  In re A.T. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.T., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E057356 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ010307) |
| v. | OPINION |
| E.R. et al., | |
| Defendants and Appellants. | |
| In re C.T., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E058022 |
| Plaintiff and Respondent, | |
| v. | |
| E.R. et al., | |
| Defendants and Appellants. | |

1

APPEAL from the Superior Court of Riverside County.  John M. Monterosso, Judge.  Affirmed.

Michele Anne Cella, under appointment by the Court of Appeal, for Defendant and Appellant mother.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant father.

Pamela J. Walls, County Counsel, and Anna M. Deckert, Deputy County Counsel, for Plaintiff and Respondent.

I

INTRODUCTION

Mother and father's domestic violence, abuse of drugs, and mental health issues led to the Riverside County Department of Public Social Services, Child Protective Services (DPSS) removing mother and father's two boys, C.T. and A.T., from their care. Parents appeal a six-month hearing order, continuing C.T. in out-of-home placement, terminating reunification services, and setting a hearing under Welfare & Institutions Code, section 366.26.[1]  Parents also appeal orders denying their petitions as to A.T., brought under section 388 (section 388 petition).  In addition, mother argues the juvenile court erred in rejecting the beneficial parent relationship exception to terminating

_____

[1] Unless otherwise noted, all statutory references are to the Code of Welfare and Institutions.

2

parental rights as to A.T. under section 366.26, subdivision (c)(1)(B)(i) (parent

relationship exception).[2]  Father joins in mother's arguments on appeal.

We conclude there was substantial evidence that parents failed to resolve the

problems that led to removal of their children.  Because parents failed to make

substantive progress, continued to have serious, intractable relationship problems due to

parents' personality disorders, and had not benefitted from services, the children

remained at substantial risk of harm and therefore the juvenile court did not abuse its

discretion in ordering during the six-month hearing that C.T. was to remain in out-of-

home placement.  The court also did not abuse its discretion in denying parents' section

388 petitions as to A.T., rejecting the parent relationship exception, and terminating

parental rights as to A.T.  The judgment is affirmed.

## II

## FACTS AND PROCEDURAL BACKGROUND

*A.  Petition for Juvenile Dependency and Detention of A.T.*

Parents married in October 2009.  In June 2010, parents' son, A.T., Jr. (A.T.), was

born.

---

[2]  This court has consolidated for appellate briefing, oral argument and decision, parents' appeal of the order terminating parental rights on September 6, 2012, as to A.T. (case No. E057356) with parents' appeal of the order terminating parental rights on December 6, 2012, as to C.T. (case No. E058022).  Case No. E058022 has been incorporated and placed with mother's writ petition, challenging the September 6, 2012, six-month hearing order as to C.T. (case No. E057094).  The writ petition has been withdrawn and dismissed.

3

During the evening of August 29, 2010, the police were dispatched to parents' home, in response to maternal grandfather's 911 call, reporting that parents were arguing. According to mother, when she returned home that evening, she found father and three teenage females in parents' home. Because mother was upset, she slapped father, grabbed a knife from the kitchen, and stabbed father on the back of his right shoulder. The wound was less than an inch long, was not deep, and did not require medical treatment. Mother then grabbed one of the teenager's cell phones and called A.T.'s maternal grandparents (grandparents) to pick her up. Father tried to grab the phone away from mother, slapped mother in the face, and pushed her, causing her to fall to the ground. A.T., who was two months old, was at his grandparents' home at the time of the domestic violence incident.

Grandparents arrived at parents' home before the police arrived. Grandmother slapped father in the face. Father left the residence but later returned. The police arrested father for misdemeanor domestic battery, being under the influence of a controlled substance, possibly cocaine, and hitting mother. Mother was arrested for stabbing father. Parents were later released and charges were dropped due to insufficient evidence. Parents claimed this was their first domestic violence incident. Parents did not have any prior criminal history.

The following day, DPSS received an immediate response referral, alleging "Caretaker Incapacitated & General Neglect," including domestic violence, failure to protect, and inadequate supervision. Mother reportedly arrived at urgent care after she was released from jail. She was crying and appeared depressed. Mother stated she had

4

slight bruising on her wrist, and pain in her head, neck, back, and wrists. She was examined and cleared to go home. Mother said she was going to stay with grandparents.

On August 30, 2010, the DPSS social worker and Police Officer Vanwick went to parents' apartment. Father was standing outside with three young women, ages 16, 17, and 18, whom the DPSS social worker interviewed. They stated they were at father's apartment getting ready to go out with a friend of father's, who was a neighbor in the apartment complex. Mother arrived and yelled at them to leave or she would grab a knife. Father tried to intervene. Mother grabbed a knife and tried to stab the girls. As the girls were leaving and father was trying to hold mother back, mother stabbed father in the shoulder. The social worker attempted to interview father but he said his lawyer advised him not to talk. Father was uncooperative and combative.

The social worker and police then went to grandparents' home and spoke to mother, who was cooperative. Mother said that, on August 28, 2010, she and father had gotten into an argument about mother telling grandmother that parents were having marital problems. After the argument, father left and mother gave notice of termination of their apartment lease to their landlord. Mother decided to stay with grandparents. The incident, as described by the three teenagers, occurred a couple of days later when mother went to retrieve her and A.T.'s belongings from parents' apartment.

Mother reported that there had been a prior domestic violence incident in which father slapped her face when she was pregnant. Father had also pushed her two different times during her pregnancy. On one occasion she went to the hospital because she was bleeding due to stress in the home. Mother conceded that, before her pregnancy, she and

5

father used marijuana and cocaine together. Father continued using cocaine. She found it in the house and told father not to use it around the baby. When the social worker asked if mother would submit to a drug test, she declined but admitted she had used marijuana three weeks earlier. Mother said she wanted to work things out with father and get back together with him.

During a telephone interview with the DPSS social worker on August 31, 2010, father said he worked for the Murrieta School District and Riverside County Office of Education, assisting with autistic and mentally ill children. He was A.T.'s primary caretaker while mother was working as a teacher's assistant for the Murrieta Unified School District. Father believed that mother might be suffering from "post partum depression." Father denied using drugs but refused to submit to a drug test. He acknowledged that he and mother had gotten into a bad argument recently. They decided to separate temporarily but he wanted to reconcile with mother. Father explained that the three young women involved in the recent domestic violence incident were friends of his 18-year-old cousin, who was staying at his residence. When father tried to stop mother from stabbing the young women, mother stabbed father in the shoulder.

DPSS removed A.T. from parents' and grandparents' care and placed him in a foster home after parents were arrested for the domestic violence incident. On September 1, 2010, DPSS filed a juvenile dependency petition under section 300, subdivision (b), alleging parents failed to protect A.T. by engaging in domestic violence on or about August 30, 2010, resulting in parents being arrested; by abusing controlled substances; by

mother using drugs while breastfeeding A.T.; and by mother suffering from unresolved mental health issues, such as depression.

At the detention hearing on September 2, 2010, the juvenile court ordered A.T. detained. The court also ordered reunification services for parents and supervised visitation, conditional upon parents not abusing drugs.

B. *Jurisdiction/Disposition Hearing as to A.T.*

DPSS concluded that because of parents' serious relationship issues and the domestic violence incident, A.T. would be at risk of physical and emotional harm if returned to parents' care. Mother appeared to be struggling with postpartum depression and might be substituting marijuana for legal prescription medication. Mother admitted needing to see a psychiatrist. Because mother was breast feeding A.T., there was the risk that the drugs might enter A.T.'s system. Both parents were abusing controlled substances and their drug abuse was contributing to anger and violence issues. Parents were also at risk of being arrested for use of illegal drugs.

Parents were visiting A.T. twice a week. Their visits were appropriate and parents appeared to be bonded with A.T. Nevertheless, DPSS recommended A.T. remain in out-of-home placement. DPSS concluded: "The combination of drug use and mental health issues, along with domestic violence that is occurring in the home, is creating a detrimental environment for the child and he is not safe in parental care until the parents are able to demonstrate sobriety, stability, and appropriate means of controlling their anger." The second week of September 2010, mother moved out of parents' apartment.

7

In February 2011, she moved in with grandparents. Father lived in an apartment in Winchester.

During the jurisdiction/disposition hearing in September 2010, DPSS filed an amended juvenile dependency petition, deleting some of the allegations relating to parents' arrest. The allegation that mother was depressed was also deleted. The juvenile court found true the allegations in the petition, as amended, and ordered A.T. removed from parents' custody. The court authorized unsupervised day visits in a public setting.

*C. Six-Month Hearing as to A.T.*

DPSS reported in the six-month status review report, filed in March 2011, that, although parents had separated because of the juvenile dependency proceedings, they intended to remain married and a "team." They did not intend to separate romantically or emotionally. Parents participated in supervised visits for one hour, twice a week. Parents visited A.T. together until November 2010. In January 2011, mother was permitted to have unsupervised visits in a public place, conditional upon father not attending the visits.

In February 2011, DPSS authorized A.T. to be returned to mother's care, conditional upon mother residing with grandparents and complying with her case plan. However, on March 7, 2011, grandmother reported that on March 3, 2011, she asked mother when she would start transitioning A.T.'s items to grandparents' home, and mother responded, "none of your f*&^ing business.'" Mother further stated that once her son was returned to her on March 25, 2011, she and her husband were going to leave the state "so no one will be 'in their f*%$ing business." Grandmother also reported that,

although mother had moved in with grandparents, she was spending weekend nights with father and treating grandparents' home like a hotel. Grandmother said she was concerned about A.T.'s safety. DPSS changed mother's visits back to supervised visits.

DPSS reported that father was extremely controlling and hostile toward the caregiver. The social worker and caregiver were uncomfortable around father and fearful of him. On one occasion, after a visit, he yelled at the caregiver that "My son is not with my wife right now, because of you!," and then followed behind the caregiver's car. Father became belligerent, adversarial, and defiant, particularly whenever the social worker told him he could not do something. Mother appeared to be highly influenced by father and unable or unwilling to protect herself and A.T. from father. DPSS was concerned that parents would commit domestic violence in the future.

In March 2011, DPSS filed an ex parte request for a temporary restraining order (TRO). The request for a TRO arose from an incident in March, when A.T.'s caregiver took A.T. to the hospital for an exam, due to A.T. experiencing seizure-like behavior. A couple of days before the exam, parents were invited to participate in the exam, but were told only one parent could be present during the exam and A.T.'s caregiver would hold A.T. while he was put to sleep for the exam. During the exam, A.T.'s caregiver called the social worker and said that parents appeared at the hospital and insisted the exam could not go forward unless mother held A.T. during the procedure. Father was "ranting and raving," yelling, and making threats, including telling the caregiver, "You will learn how it feels when your daughter is taken from you. Trust me you will know!" The exam took place after hospital security escorted parents out of the hospital.

9

During the six-month hearing in March 2011, the juvenile court issued a TRO, prohibiting parents from stalking, contacting, or being within 100 yards of A.T.'s caregiver, her family, and A.T., other than during visitation. Parents were also prohibited from attending any of A.T.'s doctor's appointments and from taking A.T. out of state. The court authorized supervised visitation for both parents and ordered father to undergo a psychological evaluation.

According to father's psychological evaluation in April 2011, father was provocative and antagonistic with virtually everyone. He was prone to deny and rationalize his marital problems, and overreact. His personality disorders were engrained patterns of personality which were unlikely to improve. The evaluator concluded: "The difficulty with [father], therefore, is that he has [] virtually no insight into his own dynamics and does not perceive there is anything he needs to change in any manner."

In an April 2011 addendum report, DPSS reported that A.T.'s EEG test results were abnormal. A.T. had developmental delays and developmental coordination disorder. A.T. was diagnosed as having Generalized Seizure Disorder and was prescribed medication. At the contested six-month hearing in April 2011, the court found parents had made minimal progress on their case plans. The court determined that A.T. was a medically fragile child and ordered medical fragile training added to parents' case plans. The court also extended until April 2014, the previous TRO against father because of the need to have A.T. evaluated by Inland Regional Center (IRC) and because of father's threatening statements and gestures directed at A.T.'s caregiver. It was later determined, after testing, that A.T. qualified for IRC services.

10

In July 2011, mother told the social worker during a supervised visit that she was pregnant, that father was the biological father of the unborn child, and parents intended to live together after the child's birth.

In September 2011, the court denied parents' requests for unsupervised overnight, weekend visits and authorized visitation once a week for one and a half hours per visit as to each parent.

*D. Birth and Addition of C.T. to Juvenile Dependency Petition*

In September 2011, mother gave birth to parents' second son, C.T. After receiving a referral, a DPSS social worker visited mother and found her living with father. Mother was hiding in a bedroom with C.T. C.T. was removed from parents' care on September 20, 2011, and placed with grandparents. On September 22, 2011, DPSS filed a juvenile dependency petition as to C.T., alleging parents failed to protect C.T., and C.T.'s sibling, A.T., was currently a dependent of the juvenile dependency court due to general neglect. C.T. was added to the existing juvenile dependency case regarding A.T.

DPSS reported in the September 2011 detention hearing report regarding C.T. that parents continued to minimize the events leading to removal of A.T. and had concealed their current living arrangements, pregnancy, and birth of C.T. Mother admitted father had been living with her during the past two or three months. Parents told the social worker they wanted to be together. Father claimed there was no order prohibiting them from doing so. The social worker reminded father that the court had previously authorized family maintenance services to mother conditional upon father not residing in

11

her home. Father responded that this was a "conspiracy" to adopt A.T. and "a joke," and there were never any safety issues with him in the home.

The social services worker concluded parents lacked understanding and insight into their case and how it might impact their ability to care for C.T. They minimized the negative dynamics of their relationship. Father was controlling and aggressive, and mother defended father's behavior. Parents also attempted to defy and manipulate the juvenile dependency system. DPSS further concluded reunification services offered to parents had been ineffective in preventing or eliminating the need for removal of A.T. from parents' home. The social services worker reported that following parents' medically fragile training in August 2011, father threatened to kidnap A.T., stating, "I can get my son from any of them. What are they going to do? I'll make them get in a full pursuit before they even attempt to get him back." Parents threatened grandparents because they had accepted placement for A.T. and C.T., and blamed them for giving notice of C.T.'s birth and for C.T.'s removal.

At the detention hearing, the juvenile court ordered C.T. detained and placed with grandparents. The court also ordered reunification services for parents and authorized supervised visitation for mother three times a week for eight hours per visit, and twice a week for two hours per visit as to father, conditional upon parents not abusing drugs. The court issued another TRO against father, restraining him from contacting, stalking, or disturbing grandparents or C.T. Father was also ordered not to remove C.T. from the state.

12

*E. Twelve-Month Status Review Hearing as to A.T.*

DPSS reported in its 12-month review report and addendum as to A.T. that A.T. had been living in a medically fragile certified foster home since September 21, 2011. A.T. was diagnosed as having generalized epilepsy/seizure disorder. His foster parents reported that A.T.'s seizure activity increased after he visited with parents. Mother stated that she could not live without father, she needed his help raising C.T., and parents intended to live together when A.T. was returned to their custody. Parents reportedly had failed to demonstrate sufficient benefit from 12 months of reunification services as to A.T. and remained in denial of risk and safety issues as to their children. Parents continued consistently to visit A.T., with the exception father did not visit him from August 22, 2011, to September 15, 2011. Parents' visits were supervised.

At the 12-month status review hearing in December 2011, the trial court found that parents had failed to complete their case plans and ordered reunification services continued. The court authorized placement of A.T. with grandparents. After A.T. was placed with grandparents, mother was authorized to visit him at grandparents' home. If father also visited A.T. there, a third party was required to supervise visits.

*F. Detention Hearing as to C.T.*

DPSS reported that C.T. was residing with grandparents. Parents were not in compliance with their court ordered case plan as to A.T. and remained in denial of risk and safety issues that originally placed the family before the court. They continued to minimize the events that led to removal of A.T. and were not forthcoming with their living arrangements and birth of C.T. Parents additionally failed to comply with

13

directives of law enforcement and the investigative worker on September 20, 2011, during the child welfare check of C.T. DPSS concluded C.T. was at risk of abuse and neglect if left in parents' care.

At the detention hearing on September 23, 2011, the juvenile court ordered C.T. detained. The court further ordered reunification services for parents and supervised visitation three times a week, for eight hours per visit as to mother, and twice a week, for two hours per visit as to father. The court issued another TRO against father, protecting C.T.'s caregiver, her family, and C.T.

G. *Jurisdiction/Disposition Hearing as to C.T.*

DPSS reported in the jurisdiction/disposition hearing report that father's anger issues remained unresolved. In August 2011, father had threatened to kidnap A.T. from the court's jurisdiction. During the DPSS investigation on September 20, 2011, father had difficulty remaining calm and was warned by deputies to remain calm during the interview. Father had not benefited from his court-ordered case plan. Parents continued to show lack of insight as to the effects domestic violence had on their children. Parents stated they wanted to remain together, even though the court had ordered family maintenance services conditioned upon father not residing in the family home. Father claimed that parents had forgiven each other and moved on with their lives. Father denied ever having a drug problem. Because parents denied the severity of the domestic violence and did not address issues of domestic violence, DPSS recommended terminating reunification services and setting a section 366.26 hearing for C.T.

14

At the jurisdiction/disposition hearing in December 2011, the juvenile court found true the allegations in the petition and amended petition as to C.T., and ordered C.T. removed from parents' custody. The court further found parents had not made any progress toward alleviating or mitigating the causes necessitating placement. The court ordered continued reunification services for parents and visitations as previously ordered. The court ordered mother to undergo a psychological evaluation and provide the court with a medication evaluation. Parents were also ordered to participate in conjoint therapy.

*H. Eighteen-Month Status Review Hearing as to A.T.*

DPSS reported in its 18-month review report and addendum as to A.T. that A.T. had moved from his medically fragile certified foster home to grandparents' home on December 15, 2011. C.T. continued residing with grandparents.

Mother told DPSS in January 2012 that she was looking for a new place to live because her attorney told her she needed to have her own residence at the time of A.T.'s 18-month hearing. Mother was currently living with A.T.'s paternal grandmother but claimed she was not residing with father. However, father reportedly was also residing with paternal grandparents. Father indicated he intended to remain married. He also indicated he believed his relationship status with mother was irrelevant to the juvenile court's concerns. Father's employment status was unclear. He had claimed he was employed with the Riverside County Office of Education but later said he was on administrative leave with pay until he got his son back.

15

A.T. continued to experience seizures, as often as twice a day, and took medication to control them. Parents were less prone to over-stimulate A.T. during visits than in the past because there were two children to visit instead of one. The court ordered parents' educational rights as to A.T. limited and assigned the educational rights to A.T.'s foster parents because of parents' resistant and oppositional stance regarding A.T.'s medical diagnosis and the need for A.T.'s caregiver to participate in IRC services on A.T.'s behalf.

Parents participated in individual and couples therapy, domestic violence awareness and training, parenting education, Family Preservation Court, and DPSS Medically Fragile Training. Mother continued to exhibit an unhealthy relational dynamic with father. She made excuses for father's inappropriate behavior and denied there were any significant problems with parents' relationship. Father's visitation was inconsistent. Mother indicated her relationship with father was a priority, even when advised DPSS was recommending terminating reunification services. Mother's random drug tests were all negative.

DPSS reported that Dr. Suiter, who performed psychological evaluations of parents, concluded that mother was in denial about there being any significant problems with her relationship with father and it was unclear whether mother would benefit from therapy. Mother reportedly had been participating in individual weekly and biweekly therapy, beginning in February 2011. Her therapist reported that mother accepted responsibility for her aggressive behavior during the domestic violence incident leading to removal of A.T. and demonstrated increased insight into A.T.'s special medical and

16

developmental needs. However, mother continued to make excuses for father's inappropriate behavior and had made minimal progress in gaining insight into the dynamics of her marital relationship. The DPSS social worker concluded mother and father had not sufficiently benefited from reunification services or successfully completed various components of their case plans.

Dr. Suiter reported in April 2011 that as to father, "he has . . . virtually no insight into his own dynamics and does not perceive there is anything he needs to change in any manner. Therefore, regardless of the level of interventions with him, his patterns of behaving and interacting with others will be fairly impervious to change." He "'denies being abusive in the relationship [with Ms. Romero] but admits he has avoided issues by drinking and staying out. . . .'" In addition, father reportedly had not benefited from anger management services to any significant degree. During a second evaluation in November 2011, Dr. Suiter added that, based on father's therapist's report, father had made uneven progress and was more open to being treated than anticipated. Dr. Suiter concluded this indicated father might benefit from therapy.

On numerous occasions, father had displayed an argumentative, defensive, and aggressive demeanor when discussing the juvenile dependency proceedings. Others had also expressed concerns regarding father's aggressive demeanor. The instructor of the DPSS medically fragile training course expressed concerns about father's attitude and his questionable acceptance of A.T.'s established medical diagnosis of seizure disorder. It was noted that father had previously denied that A.T. had a significant medical condition and was obstructive regarding A.T.'s receipt of medical services.

17

In January 2012, grandparents informed DPSS that they were no longer willing to allow mother to visit the children in their home because of mother's persistent focus on her relationship with father rather than her children. Mother was overheard yelling and arguing with father on the phone during her visits with the children. Future visits were to take place in public locations. In March 2012, grandparents permitted mother to resume visiting the children in their home. The social worker concluded A.T. appeared to be thriving in grandparents' home and had bonded to grandparents.

DPSS reported in an addendum report that in January 2012, mother was diagnosed with an adjustment disorder. Father had had three positive drug tests and one "no show" since December 2011. He tested positive for amphetamines in December 2011 and had two positive tests for marijuana in February and March 2012. He continued to deny any drug use.

At the 18-month contested hearing in April 2012, the juvenile court found parents had failed to make substantive progress or complete their case plans. The court terminated reunification services and set a section 366.26 hearing as to A.T. The court authorized mother to have overnight visits with A.T. at grandparents' home.

I. *Combined Hearings as to A.T. and C.T.*

**Six-Month Review Hearing as to C.T.**

In May 2012, DPSS reported father recently informed the social worker that he was no longer employed and was looking for work. Later, he said he was on administrative leave with pay. C.T. was a healthy infant. Both C.T. and A.T. were residing with grandparents.

DPSS reiterated essentially the same findings and conclusions stated in its 18-month review report and addendum as to A.T. DPSS concluded parents have failed to demonstrate they had sufficiently benefited from reunification services provided over an 18-month period as to A.T. Mother continued to exhibit an unhealthy relational dynamic with father and stated she did not understand why the court was concerned about her relationship with father, although she understood the domestic violence incident leading to the dependency proceedings was inappropriate. DPSS concluded mother had not demonstrated sufficient benefit from services or successfully completed her case plan.

On May 3, 2012, DPSS obtained an update from father's therapist, Mr. Novell, who indicated father's attitude had improved during the past four to six weeks. Mr. Novell did not recommend additional therapy for father since father had met his treatment goals of addressing his irritable mood, anxiety, poor social skills, and maintaining a clean and sober living, although Mr. Novell acknowledged he was unaware of father's positive drug tests in February and March.

The couples therapist reported in May 2012, that parents were consistently attending couples therapy and actively participating. Parents did not address the impact of father's positive drug tests on reunification. They focused on mother's aggressive action toward father at the outset of the dependency proceedings. Parents continued to minimize the court's ongoing concerns and blame others for their current circumstances rather than taking responsibility for their actions. Parents did not seem to comprehend the dependency case developments or their significance.

19

Father completed his court-ordered psychotropic medication evaluation on May 1, 2012. The evaluating doctor reported that father "'may have some personality problems,'" but did not require psychotropic medication. Father exhibited some anxiety, possibly related to the dependency case. As father left his appointment, he said, "'We're going to subpoena everybody.'" DPSS was concerned regarding father's attitudes and observed behaviors which indicated he had not benefitted from anger management services to any significant degree. Father made defiant remarks that he did not have to do anything the social worker told him, adding: "'No one is going to tell me what to do with my son.'" DPSS also concluded that father had not sufficiently benefitted from a 10-week parenting education course. Father exhibited a lack of awareness as to what was developmentally appropriate for children during his visits with C.T. and A.T. As to visitation, mother recently had begun overnight visits in grandparents' home, twice a week.

DPSS reported in its August 2012 addendum report that mother was still participating in individual therapy, which focused on avoiding future assaultive behavior, understanding the developmental needs of her children, getting along with father, and understanding the family system dynamics relating to grandparents. Father's substance abuse counselor reported in August 2012, that father had a good attitude at group meetings and was attending 12-step meetings. Since the last DPSS report, father had two negative drug tests. Because father had three positive drug tests and two "no show" tests over a five-month period after graduating from the yearlong Family Preservation Court substance abuse treatment program, DPSS concluded father had a substance abuse

problem and had not demonstrated sufficient benefit from participating in drug rehabilitation.

With regard to visitation, DPSS reported that the social worker overheard mother tell the children during a visit: "'We're going to get you back really soon, and your daddy says that once we get you back, you will never see your grandparents again.'" Because of this comment, mother's visitation was changed to supervised visitation twice a week. Mother continued to demonstrate that her relationship with father was a higher priority than her children. As to father's visitation, he continued to be late and fail to appear for some visits, although his visitation had become more consistent after reunification services were terminated in April 2012 as to A.T. DPSS concluded that because parents had not taken responsibility for their behavior and its impact on their children, and continued to minimize it, there was a substantial risk that a domestic violence incident similar to the one precipitating the dependency proceedings would occur again.

During the combined hearing, Dr. Suiter testified that father had a personality disorder, which included antisocial personality disorder, narcissistic personality disorder and histrionic traits. These personality disorders and traits were so extreme that they made it difficult for father to function on a daily basis. However, Dr. Suiter also testified that the risk of father committing domestic violence, abusing drugs, or physically abusing a child, was relatively low. Mother's therapist also testified the risk of domestic violence in the future was minimal. Mother's therapist further testified he had suggested to mother that, in order to regain custody of the children, mother live separately from father.

21

Mother, nevertheless, chose to live with father. Grandmother testified that she believed the children would be safe alone with mother but was concerned that mother would not be able to prevent father from absconding with the children to Mexico.

At the conclusion of the contested six-month hearing, on September 6, 2012, the juvenile court terminated reunification services, ordered C.T. remain in out-of-home placement, and set a section 366.26 hearing as to C.T., because parents had a history of domestic violence and they had not resolved their relationship problems. As to the domestic violence allegation, the trial court stressed that the allegation was not solely based on the stabbing incident. It also included the allegation that parents had a history of domestic violence. The court acknowledged there were no specific acts of violence reported since A.T.'s removal but nevertheless concluded parents had not adequately addressed the root cause of this violence. Parents therefore had not eliminated substantial risk to the children if returned home. The court found that during almost two years of services, parents had made "zero" progress in accepting responsibility for, and addressing, the domestic violence incident, which concerned conflict in parents' relationship over power and control. Parents' relationship problems created a propensity for similar future incidents. The court believed that the children would not be at risk with mother if she did not remain in her relationship with father but mother was committed to maintaining her relationship with father. She therefore chose being with father over her children. The court rejected Dr. Suiter's opinion that father might be capable of changing and found neither parent had made substantive progress or demonstrated a capacity to change.

22

The court also found that abuse of drugs by either parent was not a problem or risk, since there were only a couple of instances of parents using drugs in the past and the incidents were not recent. The court found there was no evidence parents continued to use drugs. Supervised visitation was ordered reduced to twice a month.

**Section 366.26 and Section 388 Hearings as to A.T.**

DPSS reported in its section 366.26 hearing report as to A.T. that, as of June 6, 2012, mother and father had moved into a mobile home in Wildomar, California. Mother reported that she was still employed by the Murrieta Valley Unified School District as a Developmental Instructional Assistant and Bus Aide, but was on summer break. Father had construction/maintenance employment in Orange County, but said the job might not last much longer.

Although parents had received 22 months of services, they, nevertheless, continued to minimize the concerns which initially brought their family to the court's attention and prevented the return of their children. These concerns included father's drug use, visitation concerns requiring restraining orders as to father, and mother's excuses for father's inappropriate behavior. Grandparents were committed to adopting A.T. and were also willing to adopt C.T. A.T. was thriving in their home and reportedly had not suffered from seizures for three months. A.T. and grandparents were strongly bonded to each other. Grandparents were willing to allow reasonable, monitored visitation to parents at grandparents' discretion, conditional upon the restraining orders against father remaining in effect.

At the section 366.26 hearing as to A.T., on September 6, 2012, the juvenile court denied parents' section 388 requests to vacate the court's order terminating reunification services (form JV-180)[3] as to A.T. on the grounds there was no change in circumstances sufficient to warrant granting parents additional services. The court further found that the beneficial parental relationship exception did not apply and ordered parental rights terminated as to A.T.

*J. Section 366.26 Hearing as to C.T.*

DPSS reported in its section 366.26 report and addendum as to C.T. that C.T. was a healthy one-year-old, with no known significant medical conditions or concerns. He had been living with grandparents since September 20, 2011. After the six-month hearing on September 6, 2012, mother consistently visited C.T. but only twice a month, as ordered by the court. Father did not participate in visitation with C.T. after September 6, 2012. Grandparents and C.T. were strongly bonded and C.T. was thriving in grandparents' home. Grandparents were committed to adopting C.T. They also were willing to allow parents to visit C.T. conditional upon the restraining orders against father remaining in effect.

In November 2012, grandmother reported that mother's employer called and said mother did not show up at work. Mother reportedly was in the hospital on a 72-hour,

---

[3] Parents' section 388 petitions (form JV-180) do not appear to be in the clerk's transcript on appeal. The reporter's transcript indicates parents' attorneys submitted the section 388 petitions as to A.T. to the juvenile court, the juvenile court returned the petitions to counsel, and parents later resubmitted them during the section 366.26 trial on August 31, 2012.

section 5150 hold and had missed three days of work. The police took her to Riverside Emergency Treatment Services because she was a possible danger to herself. Father reportedly had been drinking large amounts of alcohol on a daily basis.

Mother informed DPSS on November 20, 2012, that she was living with her grandmother in Chula Vista and parents had separated. But on November 28, 2012, grandmother reported mother had reconciled with father and they were living in San Diego with father's grandmother. Grandmother further stated that mother was very rude and aggressive toward her and maternal grandfather. Mother was not taking her psychotropic medication. Grandmother reported that mother had been placed on a 5150 hold again due to an emotional breakdown when a friend told her she could not purchase alcohol because she was taking psychotropic medications. Because mother's siblings did not want mother living with them, maternal grandfather took mother to live with his parents in Chula Vista.

At the section 366.26 hearing on December 6, 2012, as to C.T., the juvenile court terminated parental rights as to C.T. and ordered a permanent plan of adoption.

III

DENIAL OF RETURN OF C.T. AT SIX-MONTH HEARING

Before terminating reunification services and setting the section 366.26 hearing as to C.T., the juvenile court was required to find that C.T. would suffer detriment if returned to parents. (§ 366.21; *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.) Parents contend that because there was insufficient evidence of detriment, the

25

juvenile court abused its discretion in not returning C.T. to them at the six-month hearing and terminating reunification services. We disagree.

*A. Not Returning C.T. to Parents at Six-Month Hearing*

At the six-month review hearing, the juvenile court is required to return any dependent child to "the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e).) The parents' failure to participate in reunification services or to make "substantive progress" is prima facie evidence of detriment. The finding of failure to participate or failure to make progress is to be based on "clear and convincing evidence." (§ 366.21, subd. (e).) If this finding is appropriately made, the court may extend services for an additional six months only if it finds a "substantial probability" that the child may be returned to the parent at the end of that six months. (§ 366.21, subd. (e).)

We conclude there was substantial evidence supporting the juvenile court's finding of detriment to C.T. if returned to parents. The evidence shows that after a lengthy 22-month period of receiving reunification services, parents failed to address adequately the conditions and problems that brought C.T. to the attention of the juvenile court. Parents' serious relationship problems and personality disorders which led to their domestic violence and arrest in August 2010, remained unresolved. This lack of substantive progress constituted prima facie evidence of detriment, which parents failed to refute. We note that the juvenile court had already made a similar finding of detriment

26

as to A.T. five months earlier, in April 2012, when the court terminated reunification services as to A.T. and ordered A.T. to remain in out-of-home placement because there was a substantial risk of detriment to A.T's safety, protection, or well-being if returned to parents.

Parents argue there was insufficient evidence of detriment because there were no reported incidents of domestic violence after the August 2010 incident that led to the instant juvenile dependency action. But there was evidence of prior incidents. During an investigative interview in August 2010, mother stated that there had been several prior incidents of domestic violence, including when father slapped her face when she was pregnant. He also pushed her two different times during her pregnancy.

In addition to evidence of parents' history of domestic violence, there was evidence parents failed to resolve or alleviate the conditions and problems that led to the August 2010 domestic violence incident. Such factors or causes included parents' serious relationship problems and their personality disorders and mental health issues, which Dr. Suiter believed were not likely to change. Throughout the juvenile dependency proceedings, the social workers repeatedly reported that parents lacked understanding and insight into their case and how their problematic relationship might impact their ability to care for C.T. Parents minimized the negative dynamics of their relationship, blamed others for their current circumstances rather than taking responsibility for their actions, and insisted on maintaining their relationship, even though they were aware remaining together jeopardized mother's opportunity to regain custody of the boys. The social worker concluded parents had not demonstrated

27

sufficient benefit from 22 months of services and therefore had not successfully completed their case plans.

Mother and father's personality disorders and related conduct created a substantial risk that, as a couple, they would not protect C.T. or do what was in his best interest. This is apparent from parents' conduct during the hospital incident, when father threatened to cancel a medically-necessary exam for A.T. He also threatened A.T.'s foster parent. Father ranted and raved, and yelled and told onlookers he did not have custody of his son because of the caregivers. He told the caregivers if he did not have his son in his custody by the next Friday, everyone would have to pay. He told the caregiver, while pointing at her, "You will learn how it feels when your daughter is taken from you. Trust me you will know!" The medical procedure ultimately took place, after hospital security intervened and escorted parents out of the area. As a result of this incident, the juvenile court issued a restraining order against father, protecting A.T.'s caregiver from father and from father absconding with A.T. and C.T. out of state. In addition, the court ordered parents' educational rights as to A.T. limited and assigned the educational rights to A.T.'s caretakers because of parents' resistant and oppositional stance regarding his medical diagnosis and the need of the caregiver to participate in IRC services on A.T.'s behalf.

Evidence of father's angry, defiant outbursts on numerous occasions supported DPSS's and the juvenile court's concern that father would engage in conduct detrimental to C.T., including future domestic violence. There was ample evidence of father displaying an argumentative, defensive, angry, and aggressive demeanor and committing

28

inappropriate acts, with mother remaining supportive and compliant. DPSS had good reason to be concerned regarding father's attitudes and observed behaviors, which indicated he had not benefitted from parenting and anger management courses.

Father's angry, defiant outbursts raised concerns he would act on threats to commit acts which would be detrimental to C.T.'s well-being. After completing medically fragile training in August 2011, father threatened to kidnap A.T., stating, "I can get my son from any of them. What are they going to do? I'll make them get in a full pursuit before they even attempt to get him back." Father also defiantly stated that he did not have to do anything the social worker told him, adding: "No one is going to tell me what to do with my son." On another occasion, after visitation supervised by the social worker, father yelled at the caregiver that "My son is not with my wife right now, because of you!," and then followed behind the caregiver's car, creating fear in the social worker.

Parents additionally failed to comply with the directives of law enforcement and the investigative worker on September 20, 2011, during a child welfare check of C.T., which led to removal of C.T. from parents. Parents attempted to conceal from DPSS that they were living together with C.T. right after he was born. Father claimed there was no order prohibiting them from living together. When the social worker reminded father that the court had previously authorized family maintenance services to mother conditional upon father not residing in her home, father responded that this was a "conspiracy" to adopt A.T. and "a joke," and there were never any safety issues with him in the home.

Even though there were no reported incidents of domestic violence during two years of juvenile dependency proceedings, there was sufficient evidence supporting a finding of risk of harm if C.T. was returned to parents' care, because of the negative dynamics of parents' relationship, along with father's personality disorder and mother's support of his inappropriate behavior. Both parents' psychological evaluations and their therapists' observations further supported the trial court's findings that parents had failed to make "substantive progress" in resolving their marital problems. Dr. Suiter, who performed psychological evaluations of mother and father, testified that father had a personality disorder, which included antisocial personality disorder, narcissistic personality disorder and histrionic traits. Suiter concluded these disorders and adverse personality traits were so extreme that they made it difficult for father to function on a daily basis. Dr. Suiter concluded, as stated in his evaluation report, that "The difficulty with [father], therefore, is that he has virtually no insight into his own dynamics and does not perceive there is anything he needs to change in any manner; therefore, regardless of the level of interventions with him, his patterns of behaving and interacting with others will be fairly impervious to change." However, during a subsequent evaluation, Dr. Suiter acknowledged that father's therapist had reported father had made some progress and therefore Dr. Suiter changed his opinion to conclude father might be amenable to therapy.

Parents argue that their personality disorders did not show detriment. While a personality disorder alone may not be sufficient to show detriment, the propensity to commit adverse conduct, founded on a personality disorder, may support a finding of

detriment. Here, there was evidence that parents, not only had personality disorders, but also exhibited conduct attributable to the disorder which created a risk of harm to A.T. and C.T. Father's antisocial and narcissistic personality disorders, depression, and other histrionic traits, including aggressiveness and a controlling demeanor, resulted in defiant, angry, inappropriate conduct and contributed to a problematic relationship with mother. Grandparents described father as "very controlling," and that he had been that way since he was a child. The court could also reasonably find that mother's personality disorder of being delusional and making excuses for father's unacceptable behavior contributed to mother being controlled by father and not protecting the children. The social worker reported she overheard mother tell the children during a visit: "'We're going to get you back really soon, and your daddy says that once we get you back, you will never see your grandparents again.'" Depriving the children of seeing grandparents, with whom they had formed a strong bond, clearly would not be in the children's best interests.

Evidence that father had abused drugs also supported a finding as to father of a lack of progress, although at the combined hearing, the juvenile court found that father's use of drugs, after completing a drug treatment program, did not create a substantial risk to C.T. or A.T. Father had three positive drug tests and two "no show" tests over a five-month period after graduating from the yearlong Family Preservation Court substance abuse treatment program. DPSS concluded father had a substance abuse problem and had not demonstrated sufficient benefit from participating in the drug rehabilitation program. Nevertheless, the juvenile court was primarily concerned with parents'

31

unresolved relationship problems and propensity for future incidents of domestic violence in the presence of the children.

Parents' conduct as a whole demonstrated that they were not willing to put the children's safety and well-being ahead of their own interests. Mother's therapist testified that the social worker told mother that she would have a better chance of regaining custody of her children if she and father separated. Nevertheless, parents chose to continue living together, knowing the potential consequences of losing their children. Mother continued to exhibit an unhealthy relational dynamic with father and stated she did not understand why the court was concerned about her relationship with father, although she understood the domestic violence incident leading to the dependency proceedings was inappropriate.

The totality of the evidence was more than sufficient to establish that parents intended to remain together and had not progressed nor likely would progress in the future in resolving their relationship problems or personality disorders and traits which were intrinsic to their volatile, problematic relationship. Under such circumstances, the juvenile did not abuse its discretion in finding that returning C.T. to parents would create a substantial risk of detriment to C.T.'s safety, protection, or physical or emotional well-being. (§ 366.21, subd. (e).)

Father argues that under *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532 (*Kimberly F.*), the juvenile court erroneously relied on parents' personality disorders as a basis for not returning C.T. to parents at the six-month hearing. Father's reliance on *Kimberly F.* is misplaced. In *Kimberly F.*, the juvenile court denied mother's section 388

32

petition and terminated reunification services on the ground mother had a narcissistic personality. (*Id.* at pp. 521-522.) The *Kimberly F.* Court of Appeal reversed, holding that the court could not refuse to return children to their parents based on the personality disorder of narcissism. (*Ibid.*) The instant case is distinguishable from *Kimberly F.* in that *Kimberly F.* involved the denial of a section 388 petition in which the mother had demonstrated changed circumstances. Two of her children were removed because the family home was dirty. Although there was evidence mother had a narcissistic personality disorder, the *Kimberly F.* court held that this was not a valid basis for denying mother's section 388 petition because mother established that she was maintaining a clean home, and this was the sole legitimate obstacle to her children's return. (*Kimberly F.*, at p. 527.)

Unlike in *Kimberly F.*, in the instant case, parents' personality disorders were a fundamental underlying cause of their domestic violence, which led to removal of their children. Their personality disorders resulted in an unhealthy, dysfunctional, volatile relationship, which increased the probability of parents committing domestic violence and incidental physical and emotional harm to C.T. Even though Dr. Suiter testified the risk of future domestic violence was low, there was sufficient evidence supporting the trial court's finding of detriment at the six-month hearing because of parents' lack of progress in successfully alleviating the conditions requiring removal of the children from parents.

Parents' reliance on *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 290 (*Jasmine G.*) and *In re Daisy H.* (2011) 192 Cal.App.4th 713, 715 (*Daisy H.*) is also misplaced. In

33

*Jasmine G.*, the court reversed the juvenile court disposition order removal of the daughter from the parents. (*Jasmine G.,* at p. 293.) The *Jasmine G.* court held that the social worker's opinion concerning the father's marital troubles was not a valid basis for not returning the daughter to the father under section 361 because the opinion was unfounded. (*Id.* at pp. 293-294.) Here, there was substantial evidence parents had an unhealthy, problematic marital relationship at the time of removal of A.T. and parents had made little, if any, progress in resolving their relationship problems that had previously led to domestic violence.

The court in *Jasmine G.*, also concluded there was no evidence that the daughter would be at risk of physical harm if returned to her parents. In *Jasmine G.,* the social services agency removed the teenage daughter from her parents, who were separated, because both parents on separate occasions, used corporal punishment to discipline the daughter. (*Jasmine G., supra,* 82 Cal.App.4th at p. 285.) The *Jasmine G.* court explained that evidence of the social worker's subjective belief that the parents lacked understanding of their responsibility and their roles in the incidents that brought their child to the social service agency's attention was insufficient because the social worker's beliefs about lack of parental internalization of parenting skills was insufficient to support a detriment finding. (*Ibid.*) The instant case does not concern a social worker's beliefs concerning parenting skills and there is ample evidence, apart from the social worker's beliefs, that parents have not progressed in recognizing and resolving the causes that led to removal of their children.

*Daisy H.* is also distinguishable. In *Daisy H.*, the father appealed the juvenile dependency court's jurisdiction and dispositional orders declaring his children dependents of the court and removing them from his custody because of the parents committing domestic violence while in the process of divorcing. The juvenile court sustained domestic violence allegations that father had on prior occasions choked the mother, pulled her hair and, in the presence of one of the children, threatened to kill the mother. (*Daisy H., supra,* 192 Cal.App.4th at p. 715.) The court also sustained the allegation that father had mental and emotional problems preventing him from caring for the children. (*Ibid.*) The *Daisy H.* court reversed the lower court, holding the juvenile court erred in finding jurisdiction over the children. The court concluded there was insufficient evidence that the children were at risk of physical or emotional harm. (*Id.* at p. 711.)

The court explained in *Daisy H.* that under section 300, subdivision (b), requires "proof that the child suffered or is at substantial risk of suffering 'serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child. . . .'" (*Daisy H., supra,* 192 Cal.App.4th at p. 717.) The *Daisy H.* court further stated that, as to a domestic violence allegation, "Physical violence between a child's parents may support the exercise of jurisdiction under section 300, subdivision (b), but only if there is evidence that the violence is ongoing or likely to continue and that it directly harmed the child physically or placed the child at risk of physical harm. (*In re Janet T.* (2001) 93 Cal.App.4th 377, 391; *In re Heather A.* (1996) 52 Cal.App.4th 183, 194-195.)" (*Id.* at p. 717.) *Daisy H.* is

35

distinguishable in that the parents had separated and therefore there was no longer a substantial risk of the children being exposed to continuing or ongoing domestic violence.

We recognize that parents have made a concerted effort to participate in reunification services, including therapy, educational programs, and rehabilitation. But parents availing themselves of reunification services is only one consideration. "[T]he court must also consider progress the parent has made towards eliminating the conditions leading to the children's placement out of home." (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141-1142.) Because there is evidence parents have a history of domestic violence, have unresolved personality disorders, and have not resolved their relationship problems or taken responsibility for their behavior and its impact on their children, the juvenile court did not abuse its discretion in finding that there remains a substantial risk of harm to C.T. The evidence viewed most favorably to the prevailing party, DPSS, supports the juvenile court's finding that returning C.T. to parents at the six-month review hearing would create a substantial risk of detriment.

B. *Termination of Reunification Services*

We also reject mother's contention the juvenile court erred in terminating reunification services at the six-month hearing on September 6, 2012. The governing statute, subdivision (a)(1)(B) of section 361.5 provides: "For a child who, on the date of initial removal from the physical custody of his or her parent or guardian, was under three years of age, court-ordered services shall be provided for a period of six months from the dispositional hearing. . . , but no longer than 12 months from the date the child entered

36

foster care . . . ." The purpose of reunification services is "to overcome the problem that led to removal in the first place." (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748.)

At a sixth-month review hearing, a court may terminate reunification services and set a section 366.26 permanency hearing only if "there is clear and convincing evidence that reasonable services have been provided or offered to the parent . . . ." (§ 366.21, subd. (g)(1)(C).) A social services agency is required to make a good faith effort to address the parent's problems through services, to maintain reasonable contact with the parent during the course of the plan, and to make reasonable efforts to assist the parent in areas where compliance proves difficult. (*Armando L. v. Superior Court* (1995) 36 Cal.App.4th 549, 554-555.) "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) We determine whether substantial evidence supports the court's finding that reasonable services were provided, reviewing the evidence in a light most favorable to the prevailing party, DPSS, and indulging in all reasonable inferences to uphold the court's ruling. (*Id* at p. 545.)

Mother argues the juvenile court abused its discretion in terminating reunification services at the six-month hearing because, under section 366.21, subdivision (g)(1), there was insufficient evidence to support the juvenile court's finding that mother failed to benefit from reunification services. Section 366.21, subdivision (g)(1), provides that, if

the time period in which the court-ordered services were provided has met or exceeded the time period set forth in section 361.5, subdivision (1),[4] and a child is not returned to the parent's custody at the section 366.26 hearing, the court shall continue the case for up to six months for a section 366.26 hearing, provided that the hearing shall occur within 18 months of the date the child was originally taken, if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent. (§ 366.21, subd. (g)(1).)

In order to find a substantial probability that the child will be returned to the physical custody of his or her parent and safely maintained in the home within the extended period of time, the court must find all of the following: (A) The parent has consistently and regularly contacted and visited with the child, (B) the parent has made significant progress in resolving problems that led to the child's removal, and (C) the parent has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs. (§ 366.21, subd. (g)(1).)

---

[4] Section 361.5, subdivision (a)(1), provides that "(1) Family reunification services, when provided, shall be provided as follows: [¶] . . . [¶] (B) For a child who, on the date of initial removal from the physical custody of his or her parent or guardian, was under three years of age, court-ordered services shall be provided for a period of six months from the dispositional hearing as provided in subdivision (e) of Section 366.21, but no longer than 12 months from the date the child entered foster care as provided in Section 361.49 unless the child is returned to the home of the parent or guardian." Here, reunification services were terminated at the six-month hearing, which was held two weeks before the maximum 12-month period for providing services ran.

As already discussed above, there was substantial evidence establishing that mother was not making significant progress in resolving the problems that led to C.T.'s removal from her home. Such problems included serious marital relationship problems, which led to domestic violence. In addition, there was evidence mother suffered from personality disorders of being delusional and making excuses for father's inappropriate behavior, which led to mother remaining in an unhealthy relationship with father and being controlled by father. This, in turn, created the risk of mother not protecting the children from harm.

Parents were provided with services for almost two years, including almost one year of services after C.T. was removed from parents' home. During that relatively lengthy period of time, parents participated in numerous programs and therapy, yet reportedly failed to recognize and resolve their serious marital relationship problems, which precipitated domestic violence and the instant juvenile dependency proceedings. Based on the totality of the evidence, including reports and testimony by the psychological evaluator, therapists, grandparents, and parents, we conclude substantial evidence supported the court's finding that parents' had not resolved their relationship problems or taken responsibility for their behavior and its impact on their children. As a consequence, mother, as well as father, failed to make significant progress in resolving the problems that led to C.T.'s removal. The juvenile court thus did not abuse its discretion in terminating services based on the finding that parents had received reasonable services for almost one year as to C.T. and for 22 months in total as to both C.T. and A.T. (§ 366.21, subd. (g)(1)(B).)

IV

SECTION 388 PETITIONS

Parents contend the trial court abused its discretion in denying their section 388 petitions as to A.T., requesting additional reunification services.

A.  *Applicable law*

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new or changed circumstances exist, and (2) the proposed change would promote the best interest of the child.  [Citation.]  The parent bears the burden to show both '"a legitimate change of circumstances"' and that undoing the prior order would be in the best interest of the child.  [Citation.]  The petition is addressed to the sound discretion of the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion.  [Citation.]"  (*In re S.J.* (2008) 167 Cal.App.4th 953, 959-960 [Fourth Dist., Div. Two].)

In evaluating whether parents have met their burden to show changed circumstances, the trial court should consider:  (1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been. (*In re Kimberly F., supra,*56 Cal.App.4th at p. 532.) These factors become less significant once reunification services have been terminated, as in the instant case.  This is because, "[a]fter the termination of reunification services, .

. . 'the focus shifts to the needs of the child for permanency and stability' [citation], . . ." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

B. *Discussion*

The record is unclear as to the specifics of parents' section 388 petitions as to A.T. because the petitions are not included in the clerk's transcript. We nevertheless will address the issue on the merits to the extent possible based on the minute orders and reporter's transcripts. The reporter's transcripts indicate parents submitted section 388 petitions at the August 17, 2012, combined hearing. The court returned the section 388 petitions without prejudice to resubmitting them in the event evidence was presented during the combined hearings and trial, establishing changed circumstances.

During the continued combined hearing on August 31, 2012, parents resubmitted the section 388 petitions (form JV-180) as to A.T. The court requested counsel to address their section 388 petitions. Mother's attorney argued that changed circumstances consisted of parents making substantial progress in completing their case plans. As to the children's best interests, mother had spent a great deal of time visiting the children and taking care of them. A.T. knew who she was and called her mom. Father's attorney added that it was in A.T.'s best interests to grant his section 388 petition because father also had many visits with A.T., and A.T. responded to him, recognized him, and was happy around him. Father's attorney argued there were changed circumstances in that parents were attending therapy and there was a low risk of any negative behaviors, such as drug abuse, domestic violence, or child abuse endangerment.

41

Counsel for DPSS responded that parents had not established changed circumstances and granting the section 388 petitions was not in A.T.'s best interest. Parents had received a plethora of services yet failed to benefit from them. The risk of harm to the children remained because, as Dr. Suiter stated, father is "impervious to change," and it was well established that father was argumentative, combative, and uncooperative. He was diagnosed with a specific personality disorder of being antisocial, narcissistic, and histrionic, so extreme that it posed a day-to-day problem for father. Father had made statements indicating that he was more interested in doing what he wanted to do than what was in the best interests of his children.

The court took the matter under submission and, at the continued the combined hearing on September 6, 2012, the juvenile court denied parents' section 388 requests to change the court's order terminating reunification services (form JV-180). The court found that there was no change in circumstances whatsoever.

Parents argue that they established changed circumstances by showing that the issues upon which the dependency petition were based, of domestic violence and drug abuse, were entirely resolved. They further argue that there was insufficient evidence to support the court's denial of the section 388 petitions based on the following findings: (1) parents' denial of the problems leading to the dependency petition, (2) parents' unhealthy relationship dynamics, and (3) father's personality disorder.

We disagree. There was insufficient evidence that parents' circumstances changed after the order terminating reunification services as to A.T. on April 6, 2012, or that it was in A.T.'s best interest to grant the section 388 petition and order additional

42

reunification services. As discussed in the preceding sections of this opinion, there was substantial evidence that, even though parents may have made some progress, their relationship remained problematical at the time of the September 6, 2012 hearing. Parents still had not resolved their relationship problems, which appeared to be founded on their personality disorders and inability to recognize the seriousness of their problems and potential harmful impact on their children. The risk of substantial harm remained that if the children were returned to parents, the children would be exposed to domestic violence and suffer incidental physical and emotional harm.

In addition, A.T. had not lived with parents since he was two months old, and had lived with his prospective adoptive parents, who were his maternal grandparents, since he was one and a half years old (for nine months). His grandparents had cared for him as a medically fragile child due to his seizures and he was living with his brother C.T., who also likely would be adopted by grandparents.

Applying the *Kimberly F.* factors, we conclude the juvenile court did not abuse its discretion in denying parents' section 388 petitions as to A.T. The nature of the problem was serious, as conceded by mother, since parents were both arrested for domestic violence, although the boys were not present at the time. Father argues that because A.T. was not present during the domestic violence incident that led to parents' arrest and removal of A.T., the danger was relatively minor compared to other domestic violence cases. While this may be true, there was substantial evidence that parents' problematic relationship might lead to future domestic violence, although Dr. Suiter believed the probability of this was low.

43

As to the second factor, although A.T. was closely bonded to parents, he was removed from their care after living with them for only about two months and had resided with grandparents for over nine months. He was bonded with his grandparents and thriving in their home. Although parents had numerous visits with A.T., parents' visitation was primarily supervised and there was evidence that parents put their own needs and their relationship with each other ahead of A.T.

As to the third *Kimberly F.* factor, the problem leading to A.T.'s removal could not be easily removed or ameliorated because of the fundamental problems in parents' relationship and their personality disorders which contributed to their minimizing the seriousness of the problem.

We conclude the juvenile court did not abuse its discretion in denying parents' section 388 petition as to A.T., primarily because A.T. was young, he had lived with parents for only two months, he had lived with grandparents for nine months and had bonded with them, A.T.'s prospective adoptive parents were A.T.'s maternal grandparents, and A.T. was thriving and happy in grandparents' stable, loving home. The evidence was sufficient to establish that it was in A.T.'s best interests to remain with grandparents.

V

BENEFICIAL PARENTAL RELATIONSHIP EXCEPTION

The juvenile court found A.T. adoptable and terminated parental rights, finding there was no detriment to A.T. in doing so. Mother contends the juvenile court erred in rejecting the beneficial parental relationship exception to termination of parental rights.

*A. Applicable Law*

At the section 366.26 hearing, the juvenile court's task is to select and implement a permanent plan for the dependent child. When there is no probability of reunification with a parent, adoption is the preferred permanent plan. (§ 366.26, subd. (b)(1); *In re Marina S.* (2005) 132 Cal.App.4th 158, 164.) If the juvenile court finds by clear and convincing evidence that a child is likely to be adopted, the juvenile court must terminate parental rights, unless one of several statutory exceptions applies. (§ 366.26, subd. (c)(1); *Marina S.,* at p. 164.)

Under section 366.26, subdivision (c)(1)(B)(i), the parent relationship exception may apply when a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); see *In re Derek W.* (1999) 73 Cal.App.4th 823, 826 ["parent has the burden to show that the statutory exception applies."].) The "benefit" prong of the exception requires the parent to prove his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 ["the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer."].) The relationship that gives rise to this exception to the statutory preference for adoption "characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required,

although it is typical in a parent-child relationship." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

Moreover, "[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350; see also *In re K.P.* (2012) 203 Cal.App.4th 614, 621.) The juvenile court may consider the relationship between a parent and a child in the context of a dependency setting, but the overriding concern is whether the benefit gained by continuing the relationship between the biological parent and the child outweighs the benefit conferred by adoption. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1155-1156; *In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

B. *Standard of Review*

California courts have disagreed as to the applicable standard of review for an appellate challenge to a juvenile court ruling rejecting a claim that an adoption exception applies. We apply a composite standard of review here: "[W]hether an adoption exception applies involves two component determinations: a factual and a discretionary one. The first determination—most commonly whether a beneficial parental or sibling relationship exists . . . is, because of its factual nature, properly reviewed for substantial evidence. [Citation.] The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes 'a compelling reason for determining that termination would be detrimental to the child.'

[Citations.] This '"quintessentially" discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption,' is appropriately reviewed under the deferential abuse of discretion standard. [Citation.]" (*In re K.P., supra,* 203 Cal.App.4th at pp. 621-622, quoting *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)

*C. Discussion*

Throughout the juvenile dependency proceedings, mother regularly visited A.T. and maintained a strong, loving relationship with him. Mother argues that terminating parental rights would deprive A.T. of a substantial, positive emotional attachment such that he would be greatly harmed and it would create division between her and grandparents, who are A.T.'s prospective adoptive parents. But A.T. has not resided with mother since he was two months old. This was the only time mother was his primary caretaker. Mother visited A.T. as often as was permitted but the visits were supervised, usually by grandparents, and when mother provided care for A.T., grandmother assisted her. The visits were generally appropriate, with the exception of a few incidents, in which mother made inappropriate comments to A.T. Grandmother testified that around three times in July 2012, she overheard mother tell the boys that "Dad says when we get you guys back, you'll never have to see grandma and grandpa or the family again."

Mother maintained a close relationship with A.T. throughout the juvenile dependency proceedings but she did not fill a parental role. After A.T. was removed from parents in August 2010, mother visited him twice a week. In September 2011, the

47

court ordered separate supervised visitation by parents once a week for one and a half hours per visit. On January 30, 2012, grandparents requested mother's visits not take place at their home. This was because grandparents were concerned about mother's persistent focus on her relationship with father rather than making the well-being and future stability of the children a priority. For several months, mother and grandparents arranged for visits in public places. On March 1, 2012, grandparents agreed to allow mother to resume visiting at their home. For three months, beginning in April 2012, mother had extended visits. She visited the boys every day and had overnight visits twice a week. Mother sometimes would feed and care for the boys, with grandmother's assistance. Grandparents complained that mother would call grandparents at odd hours to request visits or would show up at their residence to visit at unscheduled times.

Grandparents reported that mother appeared at times to be overwhelmed with the care of both boys and grandmother told the social worker "I don't trust her," perhaps because mother would call father during her visits when she was not supposed to be talking to him while visiting. Grandparents further reported that they had observed and heard mother talking on the phone with father while she was visiting at grandparents' home. Grandparents described the telephone conversations as consisting of angry expressions and yelling.

DPSS reported that A.T. was strongly bonded to grandparents and showed a strong attachment to them. Grandparents were committed to adopting C.T. Mother also had a close bond with him but did not play a primary role as caregiver, other than during the first two months of A.T.'s life. Mother's visitation was primarily supervised because of

48

her troubled relationship with father. Although A.T. was closely bonded with mother, he also had a very strong bond with grandparents, who had known and been a part of his life since his birth.

There was no evidence that adoption of A.T. by grandparents would cause any additional opposition or rift, beyond what already existed. Grandparents had demonstrated they were committed to caring for A.T. and were providing him with a stable, loving home. Grandparents willingly facilitated mother visiting A.T. and there was no evidence they would prevent mother from doing so after grandparents adopted him, as long as the visitation was not detrimental to A.T.'s well-being. Parents, on the other hand, demonstrated their own relationship was more important to them than the best interests of the boys and had threatened that if the boys were returned to them, the boys would never see grandparents again.

No matter how loving and frequent mother's contact with A.T., and notwithstanding mother's "emotional bond" with him, mother must show that she occupied "a parental role" in A.T.'s life. (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) Mother has not demonstrated this. Even though for three months, from April to July 2012, she spent a great deal of time visiting and caring for A.T., this was a relatively brief period in his life and, during that visitation, mother was assisted and supervised by grandmother. Grandmother stated that at times she was concerned mother could not handle caring for both boys by herself.

Even assuming mother occupied a parental role for the three-month period in

49

2012, we cannot say that, under the unique circumstances in this case, mother's relationship with A.T. constituted "a compelling reason for determining that termination would be detrimental to the child," particularly since A.T. was young and had lived most of his life in out-of-home placement, including nine months with grandparents, who wished to adopt him. (*In re K.P., supra,* 203 Cal.App.4th at pp. 621-622, quoting *In re Bailey J., supra,* 189 Cal.App.4th at pp. 1314-1315.) We therefore conclude the juvenile court did not abuse its discretion in rejecting the parental bond exception. The benefit gained by continuing the relationship between mother and the boys was outweighed by the benefit conferred by adoption of A.T. by grandparents. (*In re Lukas B., supra,* 79 Cal.App.4th at pp. 1155-1156; *In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

VI

DISPOSITION

The orders on September 6, 2012, denying return of C.T. to parents' custody at the six-month hearing and denying parents' section 388 petitions as to A.T., are affirmed. The orders terminating parental rights as to A.T. and C.T. are also affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

RICHLI
J.

50